**CITIZENS FOR A BETTER GRETNA, et al., Plaintiffs-Appellees,**

v.

**CITY OF GRETNA, LOUISIANA, et al., Defendants-Appellants.**

No. 86–3863.

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1987.

---

Jon A. Gegenheimer, City Atty., Gretna, La., for defendants-appellants.

Harold E. Molaison, Gretna, La., for Mayor Ronnie C. Harris.

Alice M. Jacobs, Jack W. Jernigan, III, Ronald L. Wilson, New Orleans, La., for plaintiffs-appellees.

Before GOLDBERG, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

In this minority vote dilution case, the City of Gretna, Louisiana appeals the finding that at-large elections of Gretna aldermen violate § 2 of the Voting Rights Act of 1965 as amended in 1982.[1] This Circuit set out guidelines for evaluating minority vote dilution claims in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc) *aff'd on other ground sub nom., East Carrol Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)

(per curiam). The district court followed *Zimmer* guidelines in finding a § 2 violation within Gretna's at-large aldermanic election scheme.

Closely following after the district court's opinion of May 12, 1986, 636 F.Supp. 1113, is the Supreme Court's § 2 minority vote dilution case, *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Appellant City of Gretna claims *Gingles* replaces the pre-existing vote dilution analysis of *Zimmer,* and necessitates remand of this case. We disagree, and affirm the district court's decision.

At the heart of a § 2 vote dilution claim lies the issue of whether minorities have an equal opportunity to elect their candidates of choice. *Gingles* set out a three-part foundation for proving a § 2 vote dilution claim: first, that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; second, that the minority is politically cohesive; and third, that the majority votes sufficiently as a bloc usually to defeat the minority preferred candidate. *Gingles,* 106 S.Ct. at 2766–67. Based upon our reading of *Gingles,* we find the district court's analysis sufficient to establish a violation of § 2 existing in the at-large elections of Gretna aldermen. We first address the effect of *Gingles* on the framework previously set out by *Zimmer.* Then we discuss *Gingles'* emphasis on racial bloc voting and its application to the situation in Gretna.

---

1. Section 2, as amended, 96 Stat. 134, reads as follows:
    (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
    (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973.

## I. Background

Appellees Citizens For a Better Gretna [2] brought this class action on behalf of black registered voters in the City of Gretna. The class alleged violations of § 2 of the Voting Rights Act of 1965 as amended in 1982, 42 U.S.C. § 1983, and the Fourteenth and Fifteenth Amendments of the United States Constitution. The district court upheld the class' claim for relief under § 2 of the Voting Rights Act, and did not address the § 1983 claim or the constitutional claims.

The trial court determined the § 2 violation from factual findings structured along *Zimmer* guidelines.[3] We find none of these determinations to be clearly erroneous.[4] Hence, the issue presented is whether the factual findings support a § 2 violation under *Gingles*.

## II. *Gingles & Zimmer*

Appellant urges this Court to reverse the district court opinion because it relies on *Zimmer*. We are asked to remand the case for consideration under *Gingles*. We cannot agree that the Supreme Court in *Gingles* made the *Zimmer* analysis obsolete. In fact, the Court relied substantially on *Zimmer* as a foundation for the analytical framework prescribed for § 2 claims.[5]

Taken from the Senate Judiciary Committee Report accompanying the 1982 amendment of the Voting Rights Act, the factors to be considered in evaluating a § 2 claim include the following:

(1) The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) The extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the majority group;

(4) If there is a candidate slating process, whether the members of a minority group have been denied access to that process;

(5) The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which

---

**2.** Citizens for a Better Gretna is an unincorporated association of citizens of the City of Gretna. Its members include Jerome Black, Noreen V. Boyd, Sylvester Brown, Burnell Darensburg, Jr., Alex Gourgis, Sr., Bernice Gourgis, Warren G. Lombard, Leo Jones, Charles L. Mar, Verta M. Mar, and Sammie Walker. Each is a resident of the City of Gretna and a registered voter. They sue individually and as representatives of the class.

Appellants are Mayor William J. White and Aldermen James Bush, Sr., Salvador Marchese, Jr., Louis LeBoeuf, Jr., Gerard E. Schexnayder, and Hubert F. Uzee. They are sued in their individual capacities and as representatives of the City of Gretna.

**3.** We summarize the trial court's findings in Part II of this opinion, but a detailed account of conditions in Gretna is contained in the district court's opinion, *Citizens for a Better Gretna v. City of Gretna*, 636 F.Supp. 1113, 1116–1123 (E.D.La.1986). Gretna's history of official discrimination in voting, housing, and education casts lingering effects upon the city's black population: housing remains segregated; four times more blacks than whites lived below pov-

erty level in Gretna in 1980; Gretna's black voter turnout was 22 percent lower than white voter turnout in 1981, and 26 percent lower in 1977.

**4.** The Supreme Court in *Gingles,* upheld the "clearly erroneous" test of Federal Rule of Civil Procedure 52(a) for review of factual findings of § 2 claims, as well as for the ultimate determination of vote dilution. 106 S.Ct. at 2781. A factual finding is clearly erroneous if it is unsupported by the record or creates the firm conviction that a mistake has been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). We find neither to be the case with the district court's determinations.

**5.** *Gingles* upheld the "results test" set out in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and refined by *Zimmer,* whereby a Voting Rights Act violation may be shown by discriminatory effect. *Gingles,* 106 S.Ct. at 2759.

hinder their ability to participate effectively in the political process;

(6) Whether political campaigns have been characterized by overt or subtle racial appeals;

(7) The extent to which members of the minority group have been elected to public office in the jurisdiction.

The *Gingles* opinion traced the Senate Report guidelines (*Zimmer* factors) [6] in evaluating the North Carolina legislative election scheme there at issue. The Court found a § 2 violation based upon the totality of circumstances in North Carolina districts: "racially polarized voting, the legacy of official discrimination in voting, education, housing, employment, and health services; and the persistence of campaign appeals to racial prejudice acted in concert with the multi-member districting scheme to impair the ability of geographically insular and politically cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice." *Gingles,* 106 S.Ct. at 2782.

The district court found similar conditions existing in Gretna by following virtually identical guidelines. We briefly summarize these factual findings: (1) No black person has ever been elected alderman in Gretna, despite its population being thirty percent black. (2) Only two black candidates have run for alderman in Gretna; these in three elections. (3) Of the three Gretna aldermanic elections with black candidates, only two were capable of being statistically analyzed. (4) The two elections involved black candidate Leo Jones. He received the support of a majority of Gretna's black voters but little or no support from white voters. (5) In the 1984 presidential primary and the 1979 race for Louisiana Secretary of State, Gretna's black voters overwhelmingly supported black candidates and white voters largely did not. (6) Statistical data presented to the trial court in a correlation and regression analysis and in a homogenous precinct analysis support the existence of racial polarization (racial bloc voting) in Gretna's elections. (7) A history of *de jure* and *de facto* discrimination contributes to depressed socio-economic conditions for Gretna's blacks and a low black voter turnout. (8) An unofficial slating system excludes black candidates from Gretna city elections. (9) The Gretna majority vote requirement combines with the at-large system to produce dilution of black voting power. These factual findings are amply supported by the record, so we next consider the district court's finding of legally significant racial bloc voting.

### III. *Bloc Voting*

Racial bloc voting is the linchpin of a § 2 vote dilution claim, and plaintiffs must prove it. *Gingles,* 106 S.Ct. at 2764. The district court found significant racial bloc voting in Gretna based upon statistical data presented in a correlation and regression analysis [7] and a homogenous precinct analysis.[8]

---

6. Footnote 4 in *Gingles,* 106 S.Ct. at 2759 states: "These factors were derived from the analytical framework of *White v. Regester,* [cite omitted] as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen....*"

7. Correlation and regression analysis expresses the degree of relationship between two variables. The two variables in this case are (1) proportion of the voting age population in Gretna that is black (the independent variable) and (2) electoral support for the black candidate (the dependent variable). Statistical coefficients, "r" and "b", summarize the consistency and strength of these two variables. The "r" coefficient measures how consistently the percentage of voters supporting the black candidate (the dependent variable) varies with the black proportion of the voting age population (the independent variable). There is a positive relationship between these two variables if the percentage of voters supporting a black candidate tends to increase as the black percentage of the voting age population in the precinct increases. If the percentage of the voters supporting the black candidate decreases as the percentage of the black voting population increases, then a negative relationship exists. The more consistent the tendency, the greater the value of the "r" which can range from + 1.0 (perfectly consistent positive relationship) through 0.0 (no relationship) to − 1.0 (perfectly consistent negative relationship). Appellee's expert reported "r" values of .963 and .926 for the aldermanic elections of 1979 and 1977 respectively. For criticism of the "r" factor, see *Jones v. City of Lubbock,* 730 F.2d 233 (5th Cir.1984) (Higginbotham concurring).

8. See note 8 on page 500.

Appellant claims the district court's finding of bloc voting fails to conform to the standards set out by the Supreme Court in *Gingles*. Appellant specifies three deficiencies in the district court's analysis: (1) the district court based its finding of bloc voting on the statistical methods of appellee's expert, which are not the same methods as those relied upon by the Supreme Court in *Gingles*; (2) the district court considered statistical evidence of racial bloc voting in non-aldermanic elections, specifically the 1984 presidential primary in which Jesse Jackson ran and the 1979 race for Louisiana Secretary of State featuring black candidate Ben Jeffers; (3) by looking only at elections in which blacks were candidates, the district court focused on the race of the candidate rather than the race of the voter, which is contrary to *Gingles*. We address these claims in turn.

### A. *Statistical Analyses*

The statistical methods applied in Gretna vary to some extent from those used in *Gingles*. The Supreme Court in *Gingles* stated the purpose of the bloc voting inquiry to be two-fold: "To ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." 106 S.Ct. at 2769. The Court did not mandate any particular statistical method for evaluating vote dilution claims.[9] It merely accepted the methods presented, noting them to be standard in the literature. *Gingles*, 106 S.Ct. at 2768 n. 20.

Appellants attack the validity of the regression analysis presented by appellee's expert and relied upon by the district court. This correlation and regression analysis correlates by precinct the race of the voter with votes received by a particular candidate.[10] Appellant claims that its regression analysis is superior to that of appellee's expert. Resisting the obfuscation created by dueling statisticians, we address appellant's core criticism: Leo Jones, who was one of two blacks who ran for Gretna alderman and the only black aldermanic candidate whose election results could be analyzed statistically, was *not* the aldermanic preference of Gretna's black voters.

The "b" coefficient estimates how strongly these two variables are related; that is, the extent to which the percentage of voters supporting the black candidate can be expected to change in response to changes in the black percentage of the voting age population. Thus, a "r" reading of + 1.0 shows a perfect correlation between increase in the number of black voters and increase in votes for the black candidate; the "b" reading estimates how much of an increase in votes for the black candidate will result from each incremental increase in the percentage of black voters. Appellee's expert presented "b" values of .590 for 1979 and .539 for 1977. The measures were then plotted on a graph (scattergram). *See Gretna, supra*, 636 F.Supp. at 1136–37 (graphs).

**8.** Although the district court mainly relied upon appellee's regression analysis for its finding of bloc voting, it considered the homogenous precinct analysis to be supportive of that finding. *Gretna*, 636 F.Supp. at 1128–29. The homogenous precinct analysis examined 1979 and 1977 election results from Gretna's all-white precincts and found the black candidate to finish last in every case. The analysis also examined results from Gretna's two majority black precincts and estimated Jones to have garnered 65.9 percent of the black vote in those precincts in 1979.

**9.** The *Gingles* Court affirmed a finding of bloc voting in North Carolina based upon statistical analyses of fifty-three general and primary elections involving black candidates conducted over three election years, in six multi-member districts. The methods of analysis used were extreme case analysis and bivariate ecological regression analysis. *See* 590 F.Supp. 367–72. Extreme case analysis focused on voting in racially segregated precincts; and regression analysis used racially segregated and racially mixed precincts to determine whether blacks and whites voted differently with respect to a candidate's race. These complementary methods measured correlation between voters of specified race and votes for a candidate of particular race. Political cohesiveness was determined from evidence showing black support for black candidates to range between 71 percent and 92 percent in the primaries and 87 percent to 96 percent in the general elections. The Court accepted evidence of white bloc voting, which showed that an average of 81.7 percent of white voters did not vote for black candidates in the primaries, and two-thirds of the white voters did not vote for black candidates in the North Carolina general elections.

**10.** *See* footnote 7 *supra*.

Jones ran for alderman in 1977 and in 1979. Appellee's expert concludes that in 1979, Jones received 60 to 65 percent of the black vote and 1 percent of the white vote; in 1977 he received 65 to 67 percent of the black vote and 11 to 12 percent of the white vote.[11] Appellant's expert, however, did his own bivariate regression analysis of the 1979 election and concluded that Jones only obtained about 49 percent of the black vote and 1.5 percent of the white vote.[12] Appellant cites its analysis as proof that Jones was not the black preference.

▆ According to the Supreme Court in *Gingles*, however, bloc voting can be proved in part by showing that a "significant number of minority group members

11.

APPELLEES' RESULT OF REGRESSION ANALYSIS FOR
THE 1977 AND 1979 GRETNA ALDERMANIC ELECTIONS

| Year | Correlation Coefficient | Unstandardized Regression Coefficient | Standard Error of the b | *Intercepts Left (white) Right (black) |
|---|---|---|---|---|
| 1979 Unweighted: | r= .963 | b= .590 | (.050) | 1.0% 60.0% |
| Weighted: | r= .962 | b= .648 | (.002) | 0.9% 65.7% |
| 1977 Unweighted: | r= .926 | b= .539 | (.066) | 11.2% 65.1% |
| Weighted: | r= .908 | b= .553 | (.003) | 12.0% 67.2% |

* The far right column represents the percent of votes won by black candidate Leo Jones. In each row, the top figure is Jones' percent of the white vote, and the lower figure represents his percent of the black vote.

12.

APPELLANT'S RESULTS OF BIVARIATE
ECOLOGICAL REGRESSIONS AS APPLIED TO
GRETNA ALDERMANIC ELECTIONS

Recapitulation of Bivariated Ecological Regression Analyses

| CANDIDATE | WHITE PREFERENCE | SLOPE | BLACK PREFERENCE | FRACTIONALIZATION WHITE | BLACK |
|---|---|---|---|---|---|
| Jones 79 | 1.524 | 0.478 | 49.324 | 0.030 | 0.500 |
| LaBruzza 79 | 16.034 | –0.106 | 5.434 | 0.269 | 0.103 |
| Marchese 79 | 30.782 | –0.255 | 5.282 | 0.426 | 0.100 |
| Weigel 79 | 3.087 | 0.120 | 15.087 | 0.060 | 0.256 |
| Kennedy 79 | 9.78 | –0.052 | 4.58 | 0.176 | 0.087 |
| Leger 79 | 1.795 | 0.014 | 3.195 | 0.035 | 0.062 |
| Ward 79 | 26.448 | –0.228 | 3.648 | 0.389 | 0.070 |
| Ziifle | 4.075 | –0.043 | –0.225 | 0.078 | –0.005 |

Note:

usually vote for the same candidate...." [13] Both appellant's and appellee's regression analyses reveal a "significant number" of blacks voting for Jones. This qualifies Jones as a black preferred candidate.

■ Appellant also claims that Jones was not the black preferred candidate in the 1979 aldermanic election because two white candidates received a higher percentage of the black vote than was garnered by Jones.[14] This does not negate the district court's finding of racial bloc voting. Again, *Gingles* defines bloc voting as white majority bloc voting that defeats minority preferred candidates. 106 S.Ct. at 2767. In a multiple seat election such as Gretna's aldermanic race, the minority necessarily will have more than one preferred candidate. In the Gretna elections studied, blacks exercised their right to vote to fill all at-large positions, but only one available candidate was black. Thus, it was virtually unavoidable that certain white candidates would be supported by a large percentage of Gretna's black voters. Significance lies in the fact that the black candidate preferred by the minority was defeated by white bloc voting. That blacks also support white candidates acceptable to the majority does not negate instances in which white votes defeat a black preference.

### B. *Exogenous Elections*

Appellee's analyses of other elections in which Gretna citizens had the opportunity to vote for a black candidate support the finding of a pattern of racial bloc voting in Gretna.[15] Although exogenous elections alone could not prove racially polarized voting in Gretna aldermanic elections, the district court properly considered them as additional evidence of bloc voting—particularly in light of the sparsity of available data.

Black candidates have entered Gretna aldermanic elections on only three occasions.[16] Statistics are available for two of those elections, Jones in 1977 and Jones in 1979. Appellant claims that a showing of bloc voting cannot be premised solely on these two elections because the *Gingles* opinion requires "a searching practical evaluation of 'past and present reality.'" 106 S.Ct. at 2764. Two elections, it claims, do not reflect past and present reality.

*Gingles*, however, suggests flexibility in the face of sparse data: "where a minority group has begun to sponsor candidates just recently the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." 106 S.Ct. at 2770 n. 25. Justice Brennan speaking for the Court, explains the need to tailor a § 2 analysis that will fit the issues of each particular vote dilution case. In this case, appellants would have us interpret *Gingles* rigidly so that the inability of Gretna's blacks to participate as aldermanic candidates would

13. *Gingles, supra*, 106 S.Ct. at 2769. We realize that this statement imposes the requirement of a pattern of bloc voting by its mention of "usually." We find evidence, beyond Jones' performance in elections, that establishes a pattern of bloc voting. This evidence together with the Supreme Court's recommendation of flexibility for § 2 cases, are discussed in Part III B of this opinion, *infra*.

14. Appellant demonstrates that, using appellees method of analysis, white candidates Bush and LeBouef each took 70% of the black vote in Gretna's 1977 aldermanic election, whereas Jones only received approximately 67%.

15. In the 1984 presidential primary, Gretna's black voters overwhelming supported Jesse Jackson; Gretna's white voters did not. In the 1979 election for Louisiana Secretary of State, a majority of Gretna's black voters supported black candidate Ben Jeffers; and Gretna's white voters did not.

| Results of Exogenous Elections | | |
|---|---|---|
| Election | White (%) | Black (%) |
| 1984 – Jackson | | |
| *Unweighted | 1.6 | 95.5 |
| *Weighted | 1.7 | 95.3 |
| 1979 – Jeffers | | |
| Unweighted | 7.5 | 70.1 |
| Weighted | 7.9 | 70.1 |

* The term "unweighted" as used here means that each precinct in Louisiana was treated as an equal unit in determining these values, regardless of the actual number of votes cast in those precincts. The term "weighted" is used to take into account differences in the number of votes across precincts.

16. Edwin Romain in 1973, and Leo Jones in 1977 and 1979.

also function to deprive them of relief under § 2. But the Supreme Court did not confine review of vote dilution claims to the factors enumerated in the opinion: "While the enumerated [*Zimmer*] factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles*, 106 S.Ct. at 2764 (footnote omitted).

■ In light of the flexible standard advised by Gingles, the district court properly considered the two non-aldermanic elections, Jackson in 1984 and Jeffers in 1979. Because the district court had statistical data of only two Gretna aldermanic elections to consider, it properly looked to voting patterns in two additional elections in which Gretna voters had the opportunity to vote for a black candidate. This evidence is relevant to showing that blacks and whites in Gretna vote differently and in bloc. Further, we are persuaded by appellee that although the Jeffers and Jackson results are not those of Gretna aldermanic elections, they qualify as a local appraisal because they reflect local voting patterns.

We need not conclude that election results from outside the challenged electoral system are always appropriate for consideration under § 2. In this case, however, with sparse relevant statistical data, the district court rightly considered exogenous elections.

## C. *The Race of the Candidate*

We consider Jones to be an aldermanic candidate sponsored by Gretna's minority group because he received a significant portion of the black vote,[17] and because he is black. Appellant claims that considering the race of the candidate is inconsistent with *Gingles'* recommendation to consider only the race of the voter. Appellant claims the district court erred in determining racial bloc voting from only those elections in which blacks were candidates.

In a plurality section of the *Gingles* opinion, Justice Brennan notes that although the black minority preferred candidate is usually black, the race of the voter—rather than the race of the candidate—is the proper focus. Hence the black preferred candidate need not necessarily be black: "Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important." *Gingles*, 106 S.Ct. at 2776.

Justice Brennan does not, however, carry majority support for this statement. Justice White specifically disavows it as indicative of interest group politics. *Gingles*, 106 S.Ct. at 2783–84 (White, J., concurring). And Judge Higginbotham, in his dissent to this Circuit's recently vacated vote dilution case,[18] shares Justice White's appraisal, warning of the potential chaos created by a lack of Supreme Court consensus on this aspect of racial bloc voting. Such forecasts properly raise concerns about the dangers in advancing interest group politics or enforcing proportional representation.[19]

■ Mindful of these concerns, we conclude that *Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate. For although the Supreme Court plurality in *Gingles* emphasizes the race of the voter over the race of the candidate, it upholds the trial court finding of vote dilution based upon analyses of only those elections in which *blacks ran*. Justice Brennan's plurality opinion is careful not to state that a black candidate is tantamount to the black preference; but implicit in the *Gin-*

17. Relying on appellees' statistics, Jones received roughly 65% of the black vote in Gretna in 1977 and 1979. Following appellant's statistics, Jones received only 49% in 1979. Both sets of statistics indicate Jones as a black aldermanic preference. *See supra,* discussion at Part III A of this opinion.

18. *United Latin American Cities v. Midland Independent School District,* 812 F.2d 1494, 1504 (5th Cir.1987) (Higginbotham, dissenting).

19. Section 2 concludes with the following: *"Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973.

*gles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate. The various *Gingles* concurring and dissenting opinions do not consider evidence of elections in which only whites were candidates. Hence, neither do we.

### IV.

We conclude that the district court was not clearly erroneous in finding that Gretna's at-large aldermanic elections violate § 2 of the Voting Rights Act. The district court decision was correctly based on a totality of the circumstances, delineated by *Zimmer* factors. Most notable among those factors is the presence of racial bloc voting in Gretna's aldermanic elections. We also note that in the entire history of Gretna, with a 30 percent black population, no black has ever been elected to municipal office. Further, we, like the Supreme Court in *Gingles*, recognize the district court's familiarity with political realities of the local area. 106 S.Ct. at 2782. We affirm the district court's finding that at-large elections of Gretna aldermen are violative of § 2. We affirm its judgment enjoining the at-large system and approving the city's proposed redistricting plan.[20]

AFFIRMED.

---

**20.** The City of Gretna plan provides for a five member board of aldermen, consisting of four aldermen elected from separate districts and one alderman elected at-large.