John MONROE, et al., Plaintiffs,

v.

**CITY OF WOODVILLE, MISSISSIPPI, Defendant.**

Civ. A. No. W85–0088(B).

United States District Court, S.D. Mississippi, W.D.

June 15, 1988.

Willie L. Rose and Deborah McDonald, Southwest MS Legal Services, McComb, Miss., for plaintiffs.

Richard T. Watson, Woodville, Miss., Dennis L. Horn, Jackson, Miss., for defendant.

## OPINION

BARBOUR, District Judge.

### Introduction

This unusual vote dilution case is brought under Section 2 et seq. of the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1973 et seq., the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1981, 1983 and 1985. The Plaintiffs are black registered voters of the City of Woodville, Mississippi. Plaintiffs allege that the city's at-large electoral system whereby all of the aldermen are elected at large dilutes black voting strength. They seek to have the city divided into four single-member electoral districts so that each of the four aldermen is elected from a separate ward. This Court earlier granted summary judgment to the Defendant on the basis that the black voting age population of 60.5% constituted an effective ma-

jority for which no remedy existed. *Monroe v. City of Woodville, Mississippi,* 636 F.Supp. 423 (S.D. Miss.1986). The Court of Appeals reversed and remanded for trial. *Monroe v. City of Woodville, Mississippi,* 819 F.2d 507 (5th Cir.1987). This Court having now conducted a trial of the matter and having considered the evidence and arguments of counsel, renders these findings of fact and conclusions of law.

### Findings of Fact

Woodville, Mississippi, is a town of 1512 persons in Wilkinson County, Mississippi. Wilkinson County is in the extreme southwest corner of the State of Mississippi, the western boundary of which is the Mississippi River. Wilkinson County has a population of 10,021, of which 66.9% is Black. The population of Woodville is 64.3% Black. Of the voting age population of Woodville, 60.5% is Black.

Woodville is one mile square in size. Although Woodville is very small in size geographically and there are some racially mixed neighborhoods, Blacks are concentrated in two neighborhoods in the northwestern part of town and in one neighborhood in the south central portion of town.

Wilkinson County and Woodville lie in one of the most rural, impoverished and economically depressed areas of the State of Mississippi. The economy of the area is based primarily on the timber industry. The predominant employer in Woodville is a sawmill which employs 40 to 50 black laborers and a few Whites in management. Thirty nine and seven-tenths percent of the black families and 10% of the white families in Wilkinson County, Mississippi, have incomes below the poverty level. Sixty percent of the working age Whites and 45% of the working age Blacks in Wilkinson County are in the labor force. In 1986 the unemployment rate was 8% for Whites and 24.8% for Blacks. Plaintiffs made much of the few managerial positions held by Blacks. Twenty-four percent of the Whites and 5% of the Blacks in Wilkinson County are employed in managerial and specialty occupations. Because of the depressed economy of the area, there are very few managerial positions available for either Blacks or Whites. Most of the white managerial positions are sole proprietorships or small family businesses. In Wilkinson County there are 3.44 persons living in each unit of black housing and 2.6 persons living in each unit of white housing. Although most businesses are owned by Whites, Blacks are employed in jobs such as grocery store cashiers and bank tellers.

The black population percentages in the City of Woodville for the past four censuses have been as follows: 1950 census, 51.0%; 1960 census, 59.0%; 1970 census, 64.0%; 1980 census, 64.3%.

Woodville has a mayor-alderman form of government under which the mayor and all four aldermen are elected at large. There are no designated posts. There is a majority vote requirement for being elected to the board of aldermen in Woodville. Since 1969 there has been no Republican candidate for alderman. Also since that date the four Democratic candidates for alderman who received the most votes in each primary election also received a majority of the votes cast and accordingly were nominated without a run-off election. Each of those was thereafter elected during the general election without opposition.

The Defendants stipulated that before 1965 there was de jure segregation which prohibited Blacks from participating in the electoral process in Woodville and Wilkinson County, Mississippi.

Prior to January 1, 1987, the election code for the State of Mississippi required voting for as many candidates as there were persons to be elected to each office or the ballot would be rendered void. However, effective January 1, 1987, the Mississippi legislature repealed the "anti-single-shot" statutory requirement in municipal elections, *Miss. Code Ann.* § 21–11–15 (Supp.1987), so that now single-shot or bullet voting is allowable in all municipal elections in Mississippi, including Woodville elections. The Mississippi legislature abolished dual county-city registration as of August 3, 1984, *see Miss. Code Ann.* §§ 21–11–3, 23–5–303(3) (Supp.1987), but county-only registrations prior to that date

do not allow city voting without separate registration in the city.

There is no formal or informal candidate slating process in Woodville, Mississippi.

Although there have been black candidates for alderman since 1969, only one black person, Charles James, has been elected as alderman in Woodville; he was first elected in 1981 and reelected in 1985. Black candidates have been more successful in Wilkinson County elections. The black Superintendent of Education has been elected three times and the black Chancery Clerk has been elected twice. Currently three of the five supervisors are black.

There is almost total social segregation of Blacks and Whites in Woodville and Wilkinson County. The public schools are attended only by black children; white children attend a private academy. The city operates a public swimming pool which is used only by Blacks. Whites use a privately owned pool. The city operates a public park which is used almost exclusively by Blacks. Although the one restaurant in town is open to Blacks and a few Blacks patronize it, that restaurant is used primarily by Whites.

On the other hand, there has been no direct proof or even inference of any substantial racial unrest, conflict or tension in either Woodville or Wilkinson County in recent years. Political campaigns have not been characterized by overt or subtle racial appeals. Although one of the Plaintiffs testified that there was an "unwritten rule" that Blacks should not go into white neighborhoods, that testimony was not credible in the face of testimony by black candidates that they have campaigned door-to-door throughout Woodville visiting every residence, black and white, without repercussion or even feeling uncomfortable.

The same witness for the Plaintiffs also complained of problems in registering black citizens in Woodville, Mississippi. He testified that when he was running for mayor and later for alderman he took black citizens to city hall to register and there experienced an intimidating atmosphere. When pressed on cross-examination, the strongest intimidation to which he could testify was a vague reference to the clerk's "frowning" at him. In stark contrast to this weak evidence are the facts that there is a deputy-clerk in the registration office who is a black person; that other Blacks who have run for office specifically testified that they experienced no intimidation when they took black people to be registered; and, that of the 826 registered voters in Woodville, 428 are Black and 364 are White (the race of the remaining 34 could not be determined)[1]. Nor was there any evidence of intimidation at the polls. In the May 14, 1985, democratic primary in Woodville 711 persons voted, 355 of whom have been identified as Black and 257 of whom have been identified as White. (The race of the remaining 99 was not identified).

There is no lack of responsiveness on the part of elected officials in Woodville, Mississippi, to the particularized needs of the black community. Woodville has employed Blacks, including a Black in a managerial position as Superintendent of Utilities, Blacks as four of its five police officers, and a Black as one of its two deputy city clerks. Garbage collection, utilities and police services are provided equally. The Plaintiffs attempted to make a case of unequal responsiveness to the needs of the black community but failed to present any substantial proof. Several of the Plaintiffs' witnesses testified that the roads were not equal based on the fact that the roads in Kaighler's Bottom, a black neighborhood, were narrower than those in white areas of town. The proof showed that the City had no control over the width of the streets in that area because only a very narrow street right-of-way was provided when the houses were originally

---

1. The chief of police who identified the race of the registered voters testified that he felt he knew all of the white voters either personally or by family. If the 34 registered voters whose race is undetermined are Blacks, 55.9% of the registered voters are Black. If those 34 are all White, 51.8% of the registered voters are Black.

built. There were no complaints that the streets throughout town were maintained differently in black and white areas and all streets within the town in both the black and white neighborhoods are paved. Even less persuasive testimony was presented by the Plaintiffs regarding unequal provision of utilities to Blacks. One of the Plaintiffs' witnesses testified that utilities cost more to Blacks than to Whites. The Superintendent of Utilities, who is himself black, specifically denied this and testified that all utility rates were exactly the same. It appears that the Plaintiffs' witness simply had contested a utility bill of his own which he had thought had been too high.

In order to meet the proof requirements of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the law of which will be discussed later, Plaintiff called as an expert witness Dr. Ronald Love, an assistant superintendent of schools at Tupelo, Mississippi, who has a doctorate in applied sociology and comparative sociology. He qualified as an expert in racial bloc voting and statistics. Dr. Love attempted to make an ecological correlation and a regression analysis of elections in Woodville. The Court does not mean to disparage Dr. Love's training or ability; however, he was working under three adverse circumstances: First, Dr. Love was initially presented with incomplete and incorrect data with which to do his study. He admitted this on the stand and, in answer to the Defendants' interrogatories regarding expert opinions, submitted first one written report and then an amended one after the first was withdrawn. Second, Woodville presents a difficult situation under which to make a valid statistical analysis of racial bloc voting for the unique reason that it has only one precinct in the entire town. Third, because Dr. Love was forced into trying to make a statistical analysis within Woodville by analyzing Wilkinson County election results, and because Blacks enjoyed considerable electoral success in the most recent county-wide elections held in 1987, he had to either soften his conclusions as to racial bloc voting by including an analysis of the 1987 county elections or eliminate the 1987 results from

his study. In any other case in which the plaintiff has the burden of proof which must necessarily rest upon expert testimony, such as in a medical malpractice case, and if the court were presented with the same quality of expert proof as presented in this case, the Court could simply say that the plaintiff had failed to carry its burden of proof. However, vote dilution cases are unique in that it is universally recognized that racial bloc voting does exist in the sense that most white voters vote for the white candidate and most black voters vote for the black candidate in elections in which candidates of both races are running. Accordingly, here this Court will specifically address the testimony of Dr. Love and his stated opinions.

In opposition to the expert testimony offered by the Plaintiffs the Defendant presented Dr. Craig Van Gelder. Dr. Van Gelder did not conduct his own analysis from original data of racial bloc voting. He limited his testimony in regard to bloc voting to a criticism of Dr. Love's testimony and stated that he could not have offered a professional opinion and would not offer such an opinion based upon the data base and methodology used by Dr. Love.

In making his regression analysis, Dr. Love used as his independent variable the black voting age population. Dr. Van Gelder testified and Dr. Love agreed that this was the third best data to use for the independent variable. The best data would have been actual turn-out data as might have been collected by exit polls. This data was non-existent. The next best data would have been the percentages of black voters to white voters among registered voters. This data could have been obtained but was not. Dr. Van Gelder accordingly testified that the use of the black voting age population softened the conclusions of Dr. Love.

Based upon the weaknesses in the data and statistical methodology evident from Dr. Love's testimony and from the criticism of his testimony by Dr. Van Gelder, the Court makes the following observations. Dr. Love based his analysis only upon the 1983 county elections involving Woodville

precincts and did not use in his final analysis the 1987 elections which were available to him. He also mixed primary elections with general elections without separate analysis. The results which he reached differed between his initial report and his final report, at least in part because of incomplete data. These matters raise questions as to the validity of his conclusions.

The statistical methodology used by Dr. Love was incomplete since he did not incorporate all available data, since he did not check original sources and eliminate errors, and since he was unable to use an overlapping percentages, or homogenous precinct, analysis because there was only one precinct within the City of Woodville. Dr. Love did try to use an overlapping percentages analysis by using a county precinct which contained a portion of the city. However, that precinct could only be used for checking county elections and only 10% of the population of that county precinct resided within the City of Woodville.

Because Dr. Love was forced into analyzing county elections, he formulated as his basic premise that the City of Woodville and Wilkinson County share similar demographic features and therefore the analysis of Wilkinson County voting tendencies is applicable to the City of Woodville itself. It is interesting to note that Dr. Love specifically testified that Wilkinson County provides equal access to the political process for Blacks based upon the success of black candidates. He testified that the only clear factors differentiating city voting practices from county voting practices were anti-single-shot voting provisions in the city, which have been repealed, and the city's at-large system.

Dr. Love was cross-examined at considerable length regarding his scattergram prepared as a part of his regression analysis. In contrast to the scattergram and explanation thereof contained in *Campos v. City of Baytown, Texas*, 840 F.2d 1240, 1247 & n. 11, apps. A & B (5th Cir.1988), the sloping line of Dr. Love's scattergram does not intersect the verticals on either side of the scattergram but begins at the zero coordinates. He testified that the points of reference in his scattergram were only estimates. The Court concludes that the scattergram and the analysis which it purports to make are so general as to be of no assistance to the Court. Although the Court has criticized Dr. Love for analyzing county races rather than city races, the Court does note that as stated above Black candidates have enjoyed considerable success in obtaining election to county offices.

Although Dr. Van Gelder did not make a full study, he did give an opinion based on an extensive hypothetical question to which there was no objection to the factual basis by the Plaintiffs. His opinion was that bloc voting by Whites usually would not be able to defeat Blacks in selecting candidates of their choice, that Blacks have not been able to elect Blacks within Woodville because they are not politically cohesive, and that Blacks are crossing over to elect Whites in significant numbers. There is direct evidence supporting these opinions. The Democratic primary election results of May 14, 1985, show that Charles James, a Black, received 405 votes for alderman and placed third. William A. Ward, the other Black in the race, received only 281 votes and placed fifth out of the seven candidates. The fourth place candidate, Andy J. Lewis, received 401 votes, which were considerably more votes than that received by Ward.

There was no real contest presented by the Defendants to the Plaintiffs' proposition that Whites in Woodville bloc vote to a significant degree for white candidates when white candidates are opposed by black candidates. The legal standard which the Plaintiffs had to prove, however, was whether there is *legally significant* racial bloc voting, that is a white bloc vote that normally will defeat the combined strength of minority support plus white crossover votes. The Court accordingly concludes as a matter of fact that in Woodville white voters vote for white candidates and that black voters bloc vote for black candidates but that black voters cross over to vote for white candidates in significant numbers so that they are not politically cohesive.

Plaintiffs presented no evidence in support of their motion to proceed with this suit as a class action. The Court's ruling on this motion had been carried with the trial of the case.

The Court in applying the law to this case is confronted with a somewhat unusual Voting Rights Act, single-member district case. Woodville is a small, rural, economically depressed town with an at-large system of electing its aldermen. It has a past history of racial discrimination as does every other Mississippi town or city. It remains a place of almost total racial segregation on a social level. On the other hand, Blacks and Whites are operating a government which is fair and responsive to Blacks in a community atmosphere of cooperation between the races and devoid of intimidation.

## CONCLUSIONS OF LAW

The Court concludes that the Plaintiffs failed to make out a class action under Rule 23 of the Federal Rules of Civil Procedure, and the Court will deny the Motion to proceed as a class action.

The Plaintiffs have proceeded on their claims only under Section 2 of the Voting Rights Act as amended, 42 U.S.C. § 1973. They have not advanced any other constitutional or statutory arguments in the trial of this matter.

Congress substantially revised Section 2 of the Voting Rights Act in 1982 to make clear that a violation could be proven by showing a discriminatory result or effect alone without proof of a discriminatory purpose. Section 2 as amended provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

*Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), addressed the 1982 Amendments to Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. The 1982 Amendments and *Thornburg* focused on a "results" test when analyzing whether challenged election systems dilute minority voting strength. The Supreme Court discussed certain factors or circumstances which might be probative of a Section 2 violation which were contained in the Senate Judiciary Committee Majority Report to the 1982 Amendments[2]. These factors have

2. The Court in *Thornburg* set forth these factors:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

been termed the *Zimmer* factors since they were refined and developed in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973), *aff'd. sub nom East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). These factors were not intended to be comprehensive or exclusive, but merely to espouse a flexible fact-intensive test of Section 2 violations. *See Houston v. Haley*, 663 F.Supp. 346, 350 (N.D.Miss.1987).

The United States Supreme Court through *Thornburg* has substantially altered the law applicable to the Voting Rights Act. The Supreme Court reduced the usefulness and materiality of the *Zimmer* factors on the issue of whether there is a violation of Section 2 of the Voting Rights Act. This Court questions the purpose of the *Zimmer* factors after *Thornburg* now that the focus of a Section 2 claim is on the *Thornburg* tripartite test of the geographic compactness and insular existence of the minority, majority bloc voting, and political cohesiveness of the minority. [See *infra* Section II]. Although the *Zimmer* factors may evidence causes of cohesiveness or bloc voting, this Court has observed that these factors may be more useful in the remedy phase of a Section 2 claim when considering whether the guideline of 65% black population or 60% black voting age population should be enhanced.

Although the proper emphasis is now on the *Thornburg* tripartite test, courts have continued to analyze the *Zimmer* factors. This Court has also received evidence of the pertinent *Zimmer* factors and will treat them as part of the "totality of the circumstances" to be considered along with the *Thornburg* tripartite test for determining whether there is a violation of Section 2 of the Voting Rights Act.

## I. ZIMMER FACTORS

In the present case the evidence established the following facts concerning the above enumerated *Zimmer* factors.

### A. *Historical Discrimination*

The parties stipulated that before 1965 there was de jure segregation and some discrimination which prohibited Blacks from fully participating in the electoral process in Woodville.

### B. *Racially Polarized Voting*

The Court has noted the difficulty in using the Report and Statistical Analysis of Racial Polarization made by the Plaintiffs' expert. The Court finds that there is obvious polarization of voting along racial lines, but there is much cross-over voting by Blacks for white candidates. The voting may be characterized as polarized, but the Court will analyze in Section II of this Opinion whether there is *legally significant* racial bloc voting such that the bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular, minority group. *Thornburg*, 478 U.S. at 48–50, 106 S.Ct. at 2766. In the City of Woodville, the "minority," that is, the black voters, are actually the numerical majority. The Court finds that black voters in the City of Woodville are not politically cohesive and white bloc voting does not usually defeat the minority's preferred candidate.

### C. *Use of Voting Practices Which May Enhance the Opportunity for Discrimination*

With a one mile square town, the Court finds that the election district is not un-

---

5. The extent to which members of a minority group in a state or political subdivision bear the effect of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg*, 478 U.S. at 36, 41, 106 S.Ct. at 2759, 2762, 92 L.Ed.2d at 38, 42; S.Rep. 28–29. The Senate Report also mentioned additional factors that in some cases would have probative value to establish a violation. These are:

A. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

B. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.*, 478 U.S. 36, 106 S.Ct. at 2759, 92 L.Ed.2d at 38; S.Rep. 28–29.

usually large so as to hinder the opportunity for Blacks to elect candidates of their choice. State election laws provide that a majority vote is required to win party nomination. The Plaintiffs have not argued that the majority vote provision impermissibly promotes discrimination. The anti-single-shot statutory provision previously in effect has now been repealed. *See Miss. Code Ann.* § 21–11–15 (Supp.1987).

### D. *Candidate Slating Process*

There has been no proof of a candidate slating process within the City of Woodville.

### E. *Socio–Economic Disparities*

As stated in the Findings of Fact, there are socio-economic disparities between Blacks and Whites in the City of Woodville. These disparities are more than off-set by the numerical advantages held by Blacks in both population at-large and voting age population.

### F. *Racial Appeals During Political Campaigns*

Political campaigns within the City of Woodville are not characterized by overt or subtle racial appeals. There was testimony that black candidates have campaigned door-to-door throughout Woodville visiting every residence, black and white.

### G. *Extent to Which Blacks Have Been Elected to Public Office*

The evidence established that Blacks have been elected to public offices in the City of Woodville, and they serve in many public offices in Wilkinson County.

### H. *Responsiveness*

The evidence established no lack of responsiveness on the part of elected officials in Woodville to the needs of the black citizens.

## II. TRIPARTITE TEST

■ The United States Supreme Court in *Thornburg* held that although the above enumerated factors are relevant in analyzing the "totality of the circumstances" to a claim of vote dilution, unless there is a conjunction of the following three circumstances the use of multi-member or at-large districts generally will not impede the ability of minority voters to elect representatives of their choice. *Thornburg,* 478 U.S. at 47–50, 106 S.Ct. at 2665–66. This has come to be known as the *Thornburg* tripartite test.

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates.... Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburg,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

Under the *Thornburg* tripartite test, Plaintiffs must prove they are sufficiently large and geographically compact to constitute a majority in a single-member district. The evidence presented in this case demonstrates that Blacks can constitute a geographically compact and insular group. *See* Exhibits P–1, P–15.

Since the United States Supreme Court decided *Thornburg,* the United States Court of Appeals for the Fifth Circuit has addressed Section 2 of the Voting Rights Act in two cases: *Citizens for a Better Gretna v. City of Gretna, Louisiana,* 834 F.2d 496 (5th Cir.1987) and *Campos v. City of Baytown, Texas,* 840 F.2d 1240 (5th Cir. 1988). In *Gretna* and *Campos* the Fifth Circuit looked at the *Zimmer* factors as a foundation for the analytical framework prescribed for Section 2 claims. The opinions, however, primarily focused on the statistical analyses involved in determining racial bloc voting and political cohesiveness

for the tripartite test of *Thornburg.* As the Supreme Court clearly stated in *Thornburg,* "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Thornburg,* 478 U.S. at 56, 106 S.Ct. at 2769; *Campos,* 840 F.2d at 1244; *Gretna,* 834 F.2d at 500. Statistical methods of bivariate ecological regression analysis and extreme case analysis were used and approved in *Thornburg,* but the Fifth Circuit has noted that the Supreme Court did not mandate any particular statistical method for evaluating vote dilution claims. *See Gretna,* 834 F.2d at 500.

■ The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. *Houston,* 663 F.Supp. at 351. One important circumstance is the number of elections in which the minority group has sponsored candidates. *Id.* In the case *sub judice,* election results from Woodville municipal elections were offered for the years 1969 through 1985. *See* Exhibit P–2. In each election year a black candidate ran for office. The Plaintiffs also offered evidence of county elections for 1983 and 1987 in which Blacks ran. Since the existence of only one precinct within the City of Woodville prevented any significant statistical analyses of municipal elections, the Plaintiffs' expert concentrated only on the 1983 county election for his statistical analysis because the 1987 elections involved much cross-over voting.

In *Gretna* and *Campos* the district courts made explicit findings on the statistical evidence presented.[3] This court has previously found that Dr. Love's statistical data and methodology were impaired and Dr. Van Gelder did not conduct an analysis of his own. It would be pointless for this Court to set out the statistical data and conduct its own analysis. The parties stipulated that the white voters in Woodville to a great degree vote for white candidates and black voters generally vote for black candidates although there are more crossover votes by Blacks. The Court has sufficient general data on which to rely without the specific findings of the statistical analyses.

Again, *Thornburg* defines legally significant racial bloc voting as white majority bloc voting that defeats minority preferred candidates. *Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2767; *Campos,* 840 F.2d at 1248; *Gretna,* 834 F.2d at 502. As explained by the United States Supreme Court, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Thornburg,* 478 U.S. 56, 106 S.Ct. at 2770. The Plaintiffs' attorney argued that black crossover votes for white candidates should be counted with the white bloc vote, but there is no authority to support this proposition. The cases clearly demand that the court consider only whether the white *bloc vote* usually defeats the black vote plus white crossover votes. *See id.; Campos,* 840 F.2d at 1248.

■ In the present case, the evidence shows that Blacks constitute the majority of the over-all population, of the voting age population, and of the number of registered voters; the evidence does not support the Plaintiffs' arguments that the white bloc vote usually defeats the minority's preferred candidates. There is no "submergence of the minority" since minority citizens (Blacks) are actually in the majority in the City of Woodville. White candidates win not because of the white bloc vote, but because of the black crossover vote. The Plaintiffs may have established a "white bloc vote", but they have not proved legally significant racial bloc voting for purposes of a Section 2 claim. If white bloc voting to a legally significantly degree is not proven, minority voters have not established that the challenged electoral structure interferes with their ability to elect their preferred candidates. *Houston,* 663

**3.** See *Campos,* 840 at 1246–48 & n. 9; *Gretna,* 834 F.2d at 501 nn. 11 & 12.

F.Supp. at 350; *see also Thornburg,* 478 U.S. at 48–49 n. 15, 106 S.Ct. at 2766 n. 15.

The evidence presented also leads this Court to conclude that black voters in the City of Woodville are not politically cohesive. The Plaintiffs' expert, Dr. Love, admittedly did not focus on the most recent county election in which Woodville citizens participated since the data revealed that there was a large black crossover vote for white candidates. *See* Exhibit P–17. The parties' experts testified that there is no set measure for determining political cohesiveness. Given the evidence that there has been consistent, substantial, crossover voting by black voters for white candidates, the Court finds that the black citizens in the City of Woodville are not politically cohesive.

## CONCLUSION

The ultimate finding of minority vote dilution is to be based on the totality of the circumstances combining the *Zimmer* factors and the *Thornburg* tripartite test. Under the language of Section 2(b) and considering the totality of the circumstances, this Court finds that Plaintiffs have failed to prove that the political processes leading to nomination or election in the City of Woodville are not equally open to participation by black voters or that Blacks have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The Court therefore finds that the at-large system of electing aldermen in the City of Woodville does not impede Blacks in their opportunity and ability to participate in the political process and to elect representatives of their choice. This system therefore does not violate Section 2 of the Voting Rights Act.

If this Court is in error in holding that the at-large system of electing the board of aldermen does not violate Section 2, it readopts its earlier ruling made on Defendants' Motion for Summary Judgment that no remedy is necessary or proper. In vote dilution cases involving single-member election districts, the Courts have developed guidelines that minority districts should be designed so that they have either a black population of at least 65% or a black voting age population of at least 60%. *See Ketchum v. Byrne,* 740 F.2d 1398, 1413–16 (7th Cir.1984). This advantage is given in order to overcome the problems caused by the *Zimmer* factors so that the Blacks of the district can elect representatives of their choice. Adoption of a guideline necessarily implies the possibility of departing from that guideline under certain circumstances. Those circumstances would include exaggeration of one or more of the *Zimmer* factors. Although this Court has found the existence of several of the *Zimmer* factors (which might require the designing of single member districts with black voting age population of at least 60% if single member districts were required), none of the *Zimmer* factors found to exist in this case is of an exaggerated nature so as to require enhancement of the guidelines. Accordingly, even if the Court were required to design single member districts, it would be proper to follow the guideline. Therefore, since Blacks constitute 60.5% of the voting age population, the entire town constitutes a district in which they can elect candidates of their choice.

The black citizens of the City of Woodville enjoy a substantial numerical advantage over the white citizens. If they were politically cohesive and so desired, they could easily exercise their electoral rights to either elect a totally black city government or to change their form of government to a ward system. They do not need the assistance of a federal court.

Accordingly, the Court finds in favor of the Defendant and judgment will be entered.