1 F.3d 1171
 Jesse L. NIPPER; Donald A. Carter; Annie Ruth Williams;
Selendra Williams; Katrina Miles; Desi Wayne Dunlap;
Carol D. Days; Anthony Days, and D.W. Perkins Bar
Association, Plaintiffs-Appellants,
v.
Jim SMITH; Dot Joyce, Director of the Florida Division of
Elections; Tommie R. Bell, Supervisor of
Elections in Duval County; and Lawton
Chiles, Governor, Defendants-Appellees.
 No. 92-2588.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 15, 1993.
 
 1
 Brenda Wright, Washington, DC, Robert B. McDuff, Jackson, MS, Denise M. Prescod, Jacksonville, FL, Mitchell F. Dolin, Covington & Burling, Washington, DC, Sherrilyn A. Ifill, New York City, for plaintiffs-appellants.
 
 
 2
 George L. Wass, Harry F. Chiles, Denis Dean, Dept. of Legal Affairs, Tallahassee, FL, Frank E. Brown, Asst. Atty. Gen., Leonard S. Magid, Jacksonville, FL, Mitchell D. Franks, Lakeland, FL, for defendants-appellees.
 
 
 3
 Rebecca K. Troth, Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, Howard C. Coker, Coker, Myers, Schickel, Cooper & Sorenson, Jacksonville, FL, for amicus curiae U.S.
 
 
 4
 Appeal from the United States District Court for the Middle District of Florida.
 
 
 5
 Before KRAVITCH and HATCHETT, Circuit Judges, and ATKINS,* Senior District Judge.
 
 ATKINS, Senior District Judge:
 
 6
 The plaintiffs/appellants are (1) Jesse L. Nipper, Donald A. Carter, Annie Ruth Williams, Selendra Williams, Katrina Miles, Desi Wayne Dunlap, Carol D. Days, and Anthony Days, black adult citizens of the United States and residents and registered voters of Duval County, Florida, and the Fourth Judicial Circuit, and (2) D.W. Perkins Bar Association, an unincorporated association of black attorneys in Duval County, Florida. They appeal from the judgment entered against them by the district court, following entry of an order finding that appellants failed to establish a violation of their rights under the Fourteenth and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973. 795 F.Supp. 1525.
 
 
 7
 Appellants challenge the method of at-large circuitwide and countywide election of judges to the Fourth Judicial Circuit Court of Florida and the Duval County Court. While appellants disagree with the district court's ruling on the constitutional issue, they seek only a review of the ruling on the section 2 claim. Appellants' Brief at 2.
 
 
 8
 For the reasons discussed below, we find that the district court erred in holding (a) that appellants failed to establish the existence of polarized voting and (b) given the presence of the Gingles threshold factors, that the appellees discharged their burden of defeating a section 2 claim, in terms of the totality of circumstances. Accordingly, we REVERSE AND REMAND.
 
 I. BACKGROUND[1]
 
 9
 Duval County's population is 24.4% black and the population of the Fourth Judicial Circuit is 21% black.[2] The twenty-eight judges on the Fourth Judicial Circuit Court are elected circuitwide and the twelve judges on the Duval County Court are elected countywide in these majority white election districts. R6-125-6. The at-large judicial elections for the Fourth Circuit and the Duval County Court are characterized by a majority vote requirement, a numbered-place system, and the use of staggered terms. R6-125-11. The election districts are very large: the Fourth Circuit covers approximately 2,017 square miles and contains a 1990 census population of 822,898; Duval County covers approximately 776 square miles and contains a 1990 census population of 672,971. Id. at 6. In order to qualify to run for a judgeship, a candidate must pay a filing fee of approximately $4,400 for county court and $5,000 for circuit court, although a candidate can avoid the fee by a petition process with a number of signatures from registered voters. Id. at 6-7.
 
 
 10
 Although the voting age populations of the Fourth Judicial Circuit and Duval County are 19% and 22% black, respectively, no black candidate has ever won a contested election. Between 1972 and 1990, five black candidates ran for seats on the two courts in six contested elections.[3] As the district court found, each of those election contests was characterized by severe polarized voting, with the majority of black voters choosing the black candidate and the vast majority of white voters supporting the white candidate, resulting in the consistent defeat of the black candidates. R6-125-9-10, 21. For example, Leander Shaw, former Chief Justice of the Florida Supreme Court, advanced to a runoff in the 1972 primary after gaining less than 25% of the white vote but 93% of the black vote in Duval County. However, he lost in the runoff against the white candidate even though Shaw had 98% of the black vote.[4] Summarizing the analyses of the six elections, the district court stated as follows:
 
 
 11
 On their face, the voting estimates for the Shaw, Buggs, Washington, Prescod, and Micks elections indicate that voting was racially polarized in those elections. Stated differently, the estimates show that blacks were politically cohesive in those judicial elections, and that the white majority voted sufficiently as a bloc to enable the majority to usually defeat the black minority's preferred candidate. The regression estimates and extreme case analyses show that in these elections, black support for the black candidates ranged from 73% to 98%, white support for the black candidate ranged from 3% to 33%, black support for the white candidate ranged from 2 to 27%, and white support for the white candidate ranged from 67% to 97%.
 
 
 12
 Id. at 21.
 
 
 13
 Testimony indicated there would have been additional black candidates but for the apparent futility of running in the existing majority white election districts in the face of such severe white bloc voting. R11-8-14 (testimony of Brian Davis); R10-118-120 (testimony of Judge Henry Adams).
 
 
 14
 At the time appellants filed this action, only one black judge had ever served on the circuit court and only one on the county court. Both reached office by way of mid-term appointments to vacancies. Id. at 14-15, 32-33; R4-64-11. At the time of trial, only one of the twenty-eight circuit judges and two of the twelve county judges were black. Id.[5]
 
 
 15
 Appellants established at trial that an election subdistrict easily could be drawn in the northwest quadrant of Duval County with a 60 percent black voting age majority and with sufficient population to elect six of the twenty-eight circuit court judges and three of the twelve county court judges. R6-125-7, 20; Plaintiffs' Exhibits 4A and 5. Appellants have not contended this would be the only remedy available; rather, they submitted evidence of the subdistrict to demonstrate that a new electoral configuration could increase the ability of black voters to elect candidates of choice. R10-160, 164 (testimony of plaintiffs' expert demographer Jerry Wilson).
 
 
 16
 As the district court found, Florida has a long history of racial discrimination in elections and in other aspects of life. R6-125-11-12. For example, until 1958, the State of Florida prohibited black citizens from attending the University of Florida College of Law. Florida A & M Law School was created in 1951 for black students, but was not accredited until several years later. When the state opened another law school in Tallahassee in 1967 at Florida State University, it closed Florida A & M Law School. R6-125-12.[6] The district court also found that "black citizens in Florida still suffer in some ways from the effects of Florida's history of purposeful discrimination," particularly in terms of pronounced socio-economic disparities. R6-125-13.
 
 
 17
 Although the district court noted that certain discriminatory devices, such as poll taxes, are no longer in effect, the court also considered recent evidence of discrimination. Referring to the 1990 report of the Florida Supreme Court Racial and Ethnic Bias Commission,[7] the district court observed: "This Report documented numerous features of Florida's justice system that allegedly have an adverse effect on the dispensation of justice to minority citizens, including the underrepresentation of minorities in the judiciary in comparison to the percentage of minorities in the total population." R6-125-12-13. The Commission reported as follows:
 
 
 18
 Clearly, the current election process, which provides for circuit-wide, at-large elections, is not yielding sufficient representation of minorities on Florida's bench. At the same time, the dramatic underrepresentation of minority judges reflected in the above statistics compels the conclusion that the appointive system, as currently structured and implemented, has itself failed to achieve racial and ethnic diversity. The Commission strongly believes that serious measures need to be considered for implementation--in both systems--which are aimed at producing a more racially and ethnically sensitive judiciary.
 
 
 19
 Plaintiffs' Exhibit 7 at 16-17. The Commission further recommended that the Florida Legislature study the feasibility of utilizing judicial election subdistricts as a means of redressing prior discrimination and increasing minority representation on the bench. Plaintiffs' Exhibit 7 at xii.[8] In addition, the Commission issued a subsequent report on December 11, 1991, which stated the following:
 
 
 20
 [T]he underrepresentation of minorities as attorneys and judges serves to perpetuate a system which is, through institutional policies or individual practices, unfair and insensitive to individuals of color in the ways described in the Commission's first report.... [B]y threatening the withdrawal of the tacit "consent of the governed," the underrepresentation of minorities in positions of responsibility in the judicial system weakens the very system of ordered liberty upon which our democracy is based.
 
 
 21
 Plaintiffs' Exhibit 15 at vii-viii; R10-114-115.
 
 
 22
 The district court also weighed evidence of black and white political participation, finding little disparity between black and white voter registration in the Fourth Judicial Circuit and Duval County. However, the evidence also showed that black voter turnout in judicial elections was lower than that of whites.[9]
 
 
 23
 The district court also relied on elections involving only white candidates, finding that black voters' candidate of choice won 68% of the thirteen contested circuit court elections and 58% of the fourteen contested county court elections held during the 1972-90 period.
 
 
 24
 In addition to evidence of voting statistics, the parties presented evidence on the issue of the "state interests" that the defendants suggested would be compromised if a subdistricting remedy were imposed. The defendants' primary witness on this point was then-chief judge of the Fourth Judicial Circuit, John Santora. Judge Santora testified that subdistricting would cause elected judges to hear cases involving one litigant from inside their district and one from outside. However, he acknowledged that the present system frequently involves litigants from outside the election district facing those from inside the district. Moreover, Judge Santora testified that judges in the Fourth Circuit and elsewhere are fair and impartial even when such situations arise. R13-198-199. Judge Henry Adams of the Fourth Circuit also testified that litigants from outside the election district frequently oppose litigants from inside the district under the current system, and that judges nevertheless are able to exercise their duties fairly and impartially. R15-5-7.
 
 
 25
 The appellants presented the testimony of Judge Robert Gibbs, a black judge elected from a Mississippi subdistrict of approximately 75,000 people, and Spencer Gilbert, a white Mississippi lawyer practicing in a jurisdiction that uses subdistricts. Both testified that subdistricting has not harmed the administration or perception of justice in that state and, if anything, has actually improved the administration and perception of justice. R15-16-33 and R15-45-51.
 
 
 26
 The reports of the Florida Supreme Court Racial and Ethnic Bias Commission stated that elimination of discrimination in judicial elections would actually enhance the state's interests, as would increasing the number of black judges. Plaintiffs' Exhibit 7 at xii, 16-17; Plaintiffs' Exhibit 15 at vii and xxiv.
 
 
 27
 As noted, based on the evidence presented at trial, the district judge found "that blacks are a sufficiently large and geographically compact group to constitute a majority in a subdistrict." R6-125-20. Additionally, he conceded that the statistics before him "ordinarily make out a sufficient showing of racial polarization in these six judicial elections." R6-125-21. Despite these findings, the district judge ruled against the appellants on the critical issue of polarized voting. Alternatively, the district court held that even if appellants had established racially polarized voting, no section 2 violation existed because the "voting community is not driven by racial bias." R6-125-28.
 
 II. STANDARD OF REVIEW
 
 28
 We review the district court's findings of fact for clear error, Thornburg v. Gingles, 478 U.S. 30, 78-79, 106 S.Ct. 2752, 2780-81, 92 L.Ed.2d 25 (1986), affording special deference to the district court due to its "special vantage point" and ability to conduct an "intensely local appraisal of the design and impact of" a voting system. White v. Regester, 412 U.S. 755, 769, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973). However, this standard does not affect this court's power to correct errors of law or findings of fact predicated on a misunderstanding of the law. See Gingles, 478 U.S. at 79, 106 S.Ct. at 2781 (citations omitted); Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547, 1554 (11th Cir.1987), cert. denied, Duncan v. Carrollton, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).
 
 
 29
 III. OVERVIEW OF SECTION 2 OF THE VOTING RIGHTS ACT
 
 
 30
 To prevail on a claim of vote dilution under section 2 of the Voting Rights Act,[10] appellants must meet certain threshold requirements which the United States Supreme Court first identified in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Under Gingles, appellants must establish (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the minority group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to cause it usually to defeat the minority's preferred candidate. 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
 
 
 31
 In addition to the three core requirements, the Gingles Court identified other factors which might be considered as part of the "totality of the circumstances" that would support a section 2 claim:
 
 
 32
 (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 33
 (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 34
 (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 35
 (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 36
 (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;
 
 
 37
 (6) whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 38
 (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.
 
 
 39
 Id. at 36-37, 106 S.Ct. at 2759 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), reprinted in 1982 U.S.Code Cong. & Admin.News 177, 206-07). Additional factors which may be probative in some cases are:
 
 
 40
 (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and
 
 
 41
 (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 
 
 42
 Id. at 37, 106 S.Ct. at 2759.
 
 
 43
 The Gingles Court noted that "this list of factors is neither comprehensive nor exclusive." Id. at 45, 106 S.Ct. at 2763. However, evidence of racially polarized voting has been recognized as "the linchpin of a section 2 vote dilution claim," and is relevant to establishing two of the three threshold Gingles requirements: the political cohesiveness of the minority group and the ability of the white majority usually to defeat the minority's preferred candidate. Citizens For a Better Gretna v. Gretna, 834 F.2d 496, 499 (5th Cir.1987), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Thus, although certain Senate Report factors, such as racially polarized voting, are more significant because of their direct bearing on the section 2 threshold inquiry, other factors are "supportive of, but not essential to, a minority voter's claim." Hall v. Holder, 955 F.2d 1563, 1568 (11th Cir.1992) (quoting Gingles, 478 U.S. at 48-49 & n. 15, 106 S.Ct. at 2765-66 & n. 15). These factors are relevant to the extent that they are supportive of the three core Gingles factors, however, they need not be present to satisfy the Gingles test. Hall, 955 F.2d at 1568.[11]
 
 IV. DISCUSSION
 
 44
 This appeal centers on two issues. First, appellants challenge the district court's conclusion that they failed to prove the existence of racially polarized voting patterns in the Fourth Circuit and Duval County. Second, appellants challenge the district court's holding that, even if appellants did show racially polarized voting, the "totality of the circumstances" did not support a section 2 claim. We address each of these contentions below.
 
 A. Racially Polarized Voting
 
 45
 As discussed above, both parties presented substantial evidence related to the degree of racial polarization in judicial elections in the Fourth Judicial Circuit and Duval County. Based on this evidence, the district judge acknowledged that the statistics before him ordinarily would establish racial polarization but nevertheless ruled that appellants failed to prove this critical factor. In so ruling, the district court gave the following reasons: (1) the judicial elections involving black candidates were stale; (2) black voters occasionally elected candidates of choice in elections involving only white candidates; and (3) two of the black-white elections involved incumbents. We now consider each of the district court's grounds for ruling against appellants on the issue of racial polarization.
 
 1. Staleness of Elections
 
 46
 The district court's decision to discount the probative value of the six elections, which took place between 1972 and 1984, because four of those elections were "stale" was incorrect for two reasons. First, this ruling is contrary to precedent in this circuit as well as other circuits. See, e.g., Solomon v. Liberty County, 899 F.2d 1012 (11th Cir.1990) (en banc ), cert. denied, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); Gretna, 834 F.2d at 500-03. In Solomon, six elections for county offices in the time period 1968-1984 were held sufficient to establish polarized voting as a matter of law. Solomon, 899 F.2d at 1013 and 1019-21 and n. 8 (Kravitch, J., specially concurring); Solomon, 899 F.2d at 1021 (Tjoflat, C.J., specially concurring). Likewise, the Fifth Circuit in Gretna, a 1987 decision, held that plaintiffs had shown polarization in a citywide at-large challenge based on two aldermanic elections occurring in 1977 and 1979 and two exogenous elections occurring in 1979 and 1984. Gretna, 834 F.2d at 501-02; see also Gingles, 478 U.S. at 82, 106 S.Ct. at 2782-83 (Court relied upon elections occurring in ten year period before the suit was filed). Moreover, appellees' own expert, Dr. Ronald Weber, conceded that black-white elections from 1972 are "recent enough to be probative of current voting patterns." R13-61-62.
 
 
 47
 Second, the district court, in effect, penalized appellants because black candidates have not run in judicial elections in the recent past. At least two witnesses, Brian Davis and Judge Henry Adams, offered credible reasons for this reluctance--the futility of running in the face of pervasive bloc-voting and the resulting pattern of black defeat in prior years. R11-12-16 and R10-117-118.
 
 
 48
 Courts have refused to deny section 2 relief simply because there are few or no elections in which minority candidates have run. See McMillan v. Escambia County, 748 F.2d 1037, 1045 (5th Cir.1984). The McMillan court explained that "the fact that no black ran [for office] between 1970 and the time this litigation commenced [is of no help] to defendants." Rather, "the lack of black candidates is a likely result of the discriminatory system." Id. Also instructive on this issue is the recital in Gingles where the Supreme Court said: "Where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25; see also, Westwego Citizens for Better Government v. Westwego (Westwego I), 872 F.2d 1201, 1208-09 and n. 9 (5th Cir.1989) (holding that plaintiffs could establish a section 2 violation even though there were no statistics available related to Westwego aldermanic elections involving black candidates because no black had ever run).
 
 
 49
 As the Fifth Circuit warned in Westwego I, the failure to consider the possibility that "black candidates 'don't run because they can't win' " in weighing such evidence "would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." Westwego I, 872 F.2d at 1209 n. 9. Thus, in keeping with the teachings of Gingles, McMillan, and Westwego I, we hold that the district court erred in discounting the probative value of the six judicial elections on the basis of "staleness."
 
 
 50
 2. Elections Involving Only White Candidates
 
 
 51
 Based upon its erroneous conclusion that the judicial elections involving black candidates were stale, the district court decided to "give some weight to all elections for circuit and county judge from 1972 to 1990 ... in determining racial polarization, regardless of the race of the candidates." R6-125-23. Thus, in holding against appellants on the issue of racial polarization, the district court relied primarily on elections involving only white candidates, concluding that "[w]hen judicial elections not involving black candidates are included in the analysis, the black candidate of choice for circuit or county judge wins the majority of the time." Id. at 25.
 
 
 52
 The genesis of the district court's approach was the plurality comment by the Supreme Court in Gingles that "the race of the candidate per se is irrelevant to racial bloc voting analysis." Gingles, 478 U.S. at 67, 106 S.Ct. at 2775. However, when viewed in the context of facts before the Gingles Court[12] and the subsequent holdings of other courts called upon to interpret the practical meaning of Gingles, it is clear that a consistent showing of polarization involving black and white candidates cannot be rebutted by evidence that black voters' candidates of choice sometimes win when only white candidates are running. As the court noted in Westwego I, "the evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates." 872 F.2d at 1208 n. 7. See also, id. ("Gingles is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter--but only within the context of an election that offers the choice of supporting a viable minority candidate.") (quoting Gretna, 834 F.2d at 503); Campos v. Baytown, 840 F.2d 1240, 1245 (5th Cir.1988) (rejecting argument that any time candidate gets majority of minority votes he is the minority group's "chosen representative," especially where there was no evidence that any Anglo-Anglo race offered voters choice of "viable minority candidate"); Davis v. Chiles, No. TCA 90-40098 MMP (N.D.Fla., Sept. 3, 1991 (slip op. at 19-20) (holding that evidence from white-white elections could not rebut showing of polarization in black-white elections). Indeed, appellees' own expert admitted on cross-examination that black-white elections are more probative than elections involving only white candidates if they provide contrary evidence. R13-48 (cross-examination of Dr. Ronald Weber). Here, unlike the white-white judicial elections relied upon by the district court, the black-white elections show that black voters have less opportunity to elect candidates of choice than white voters.
 
 
 53
 Furthermore, the district court's focus on elections involving only white candidates runs counter to this court's holding in Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547 (11th Cir.1987). There, the district court criticized plaintiffs' expert for not analyzing two white versus white sheriff's races in which one of the candidates had a black deputy sheriff who assisted the white candidate in getting elected. In rejecting the district court's holding, this court wrote: "It is the access of minority voters to the political process, not the majority's access to the black vote, which is the chief concern of Section 2 of the Voting Rights Act." Carrollton, 829 F.2d at 1559.
 
 
 54
 In sum, given the pervasive polarization in the elections involving black and white candidates, we hold that the district court erred in relying on elections involving only white candidates. Under these circumstances, evidence that black voters are sometimes able to elect candidates of choice in white only elections was an insufficient basis to find against appellants on the issue of racial polarization.
 
 3. Incumbency
 
 55
 The district court also rejected two of the judicial elections in which black candidates lost as evidence of racial polarization because the black candidates, Buggs and Prescod, ran against incumbents. The court explained its ruling as follows:
 
 
 56
 Most importantly, special circumstances in several of the judicial elections involving black candidates are damaging to Plaintiffs' attempt to prove racial polarization. In Gingles, the Supreme Court stated that minority electoral success does not foreclose a vote dilution claim if that success can be explained by special circumstances, such as the minority candidate running unopposed, or the fact that the minority ran as an incumbent. See Gingles, 478 U.S. at 57, 106 S.Ct. at 2770. The converse of this proposition must also be true. That is, any balanced consideration of a vote dilution claim should also take into account any special circumstances that may explain minority electoral failure in a polarized contest. In particular, the same special circumstances identified by the Gingles Court to explain minority success--incumbency and the absence of an opponent--should be considered in analyzing elections in which minority candidates have been defeated.
 
 
 57
 R6-125-25. Thus, the district court concluded that the Buggs and Prescod elections "[were] better viewed as evidence of the power of incumbency rather than as strong evidence of racial polarization." Id. at 26. For the reasons that follow, we conclude that the district court erred in discrediting the value of these elections as evidence of racial polarization.
 
 
 58
 First, the district judge erred in giving substantial weight to the white incumbencies as an explanation for the outcomes of the Buggs and Prescod elections given the relative weakness of the incumbents in those elections. For example, the white incumbent against whom Prescod ran in 1984 was not an attorney, a prerequisite for running for county judge in that election; rather, he was "grandfathered" in from an earlier time when non-attorneys were permitted to run for county judgeships. More significantly, the incumbent in the Prescod race received the worst ratings in the bar polls of any judge in the circuit, including an "unqualified" rating from 82% of the lawyers polled in the year he defeated Prescod. Furthermore, Jacksonville's only daily newspaper and a racially integrated public teacher's organization both endorsed Prescod. In the 1978 Buggs election, the white incumbent, who had been appointed to a vacancy, had been an incumbent judge for a mere 100 days before running against Buggs. In short, contrary to the district court's conclusion, these elections are hardly "evidence of the power of incumbency."
 
 
 59
 Second, even aside from the relative weakness of the white incumbents, the single factor of incumbency is insufficient to explain the defeat of black candidates where the evidence shows that black candidates consistently lost because of white bloc voting. In Gingles, the Court explained that
 
 
 60
 in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. Furthermore, the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as ... incumbency, ... may explain minority electoral success in a polarized contest.
 
 
 61
 Gingles, 478 U.S. at 57, 106 S.Ct. at 2770 (emphasis added, footnote omitted). We interpret Gingles to permit consideration of special circumstances only to explain variations from a usual pattern of racially polarized voting. In other words, special circumstances may explain minority electoral success in a polarized election; however, contrary to the district court's interpretation, the converse is not also true. As one court has explained, "the 'special circumstances' the [Gingles] Court had in mind were circumstances that would explain the minority candidates winning the election in spite of white bloc voting. Plaintiffs' argument turns the Court's language on its head and would have it refer to circumstances explaining the defeat of the minority's candidate...." Williams v. State Bd. of Elections, 718 F.Supp. 1324, 1329 (N.D.Ill.1989). As in Williams, we conclude that the district court erred in construing Gingles to permit consideration of special circumstances to explain minority electoral failure.
 
 
 62
 In sum, we respectfully reject as clear error each of the district court's reasons for concluding that appellants failed to show racial polarization.[13] Accordingly, we hold that the evidence in the entire record demonstrates racially polarized voting in the Fourth Judicial Circuit and Duval County.
 
 
 63
 B. Violation of Section 2 under "Totality of the
 
 
 64
 Circumstances"
 
 
 65
 Having concluded that the district court erred in finding against appellants on the issue of racial polarization, we next consider appellants' contention that the district court erred in holding that, assuming racial polarization exists, appellants failed to establish a section 2 violation. Following Judge Tjoflat's concurrence in Solomon, 899 F.2d at 1035, the district court stated that it still would have ruled for appellees because, under the totality of the circumstances, "the voting community is not driven by racial bias." R6-125-28. The court explained its ruling as follows:
 
 
 66
 Specifically, Defendants have proved that there are legitimate state interests in maintaining the current system, that eligible blacks have achieved more than proportional representation on the circuit and county courts, that no racial appeals or candidate slating processes have been used to exclude black voters or candidates from the electoral process, that the current circuit or county judges are responsive to the needs of all citizens, and that Florida's history of discrimination and the lingering effects thereof do not have a material current impact on black voters' ability to participate in the political process.
 
 
 67
 Id. at 38.
 
 
 68
 In challenging this ruling, appellants maintain that, assuming the district court is reversed on the issue of polarization, the view articulated in Solomon by Judge Kravitch dictates judgment in their favor. Solomon, 899 F.2d at 1021 (Kravitch, J., specially concurring). However, as stated, this circuit remains divided on the issue raised in Solomon, that is, whether plaintiffs can establish a section 2 violation simply by satisfying the three core Gingles factors or whether defendants can raise a lack of racial bias defense under the totality of circumstances after plaintiffs have satisfied the threshold Gingles factors.[14] We do not resolve that question today because we find that appellants have established a section 2 violation under either approach. Based on the district court's findings and our determination that appellants established racially polarized voting, we agree that appellants have met the three threshold Gingles requirements. In addition, for the reasons discussed below, we reject the district court's determination that the appellees showed an absence of racial bias.
 
 
 69
 According to Judge Tjoflat's concurrence, a plaintiff's satisfaction of the Gingles factors shifts the burden to the defendant to show that "in light of the totality of the circumstances, ... the voting communities were not driven by racial bias." Solomon, 899 F.2d at 1037. In finding that defendants had shown an absence of racial bias, the district court relied upon factors indicating that the legislature had no discriminatory purpose in adopting and maintaining the existing election districts. R6-125-28-37. For example, the court noted that the state has an interest in fostering an independent and stable judiciary. In addition, the district court relied on the fact that three black judges had been appointed over the years as evidence of minority electoral success. While these factors may support a finding that the state had "legitimate interests" in maintaining the existing election districts and that the appointing authorities were not driven by racial bias, they show nothing about the motivation of the voting communities.
 
 
 70
 The critical inquiry under the racial bias approach is whether racial bias motivates the voting community, not whether it influences the legislature in appointing judges. See Solomon, 899 F.2d at 1037; see also Meek v. Metropolitan Dade County, 985 F.2d 1471, 1487 (11th Cir.1993) (per curiam) (discussing racial bias in voting communities). Section 2 refers to the ability of black voters to elect their candidates of choice, not to the ability of black candidates to be appointed to office. Carrollton Branch of NAACP, 829 F.2d at 1560 ("While appointments ... may be evidence of the willingness of some whites to allow some black participation in the political process, it does not demonstrate the ability of blacks to get elected to political office...."). We therefore hold that the district erred in relying upon evidence indicating that the legislature, as opposed to the voting community, was not driven by racial bias.
 
 
 71
 Furthermore, as discussed above,[15] we also reject the district court's appraisal of minority electoral "success" in obtaining representation on the judiciary based on a comparison of the number of black judges to the low number of black attorneys eligible for judgeships. As the Florida Supreme Court Racial and Ethnic Bias Commission's commented: "A comparison of minority judges to the estimated eligible minority population alone is not responsive to the question of whether the Florida judiciary adequately reflects the racial and ethnic diversity of the citizens of Florida." Defendants' Exhibit 23 at 15. In finding minority electoral success based on a percentage of black lawyers, the district court improperly discounted the evidence of Florida's history of racial discrimination and the exclusion of black citizens from access to legal education in the state. Thus, the appropriate comparison is the percentage of black citizens or black voters, not the percentage of black lawyers.
 
 
 72
 Additionally, based on our review of the record, we conclude that the district court erred in ruling that Florida's history of official discrimination, along with the other Senate Report factors--the socio-economic effects of discrimination, the responsiveness of judges to the needs of the local black community, and the absence of candidate slating processes and the use of racial appeals--did not support a finding of racial bias motivating voting in the relevant communities. After recounting the long history of discrimination and the exceedingly difficult economic conditions under which black citizens live as compared to most white citizens in the Fourth Judicial Circuit, the district court discredited these factors largely because black voter registration is equal to that of white voter registration. However, as this court has observed, the fact that blacks register in approximately the same numbers as whites does not defeat or detract from a section 2 claim, especially where the evidence shows that black voter turnout is lower than that of whites. See United States v. Dallas County Commission, 739 F.2d 1529, 1538 (11th Cir.1984). In addition, this court previously has held that the absence of candidate slating processes and racial appeals is insufficient to defeat a section 2 case. See United States v. Marengo County Commission, 731 F.2d 1546, 1571 (11th Cir.), cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); see also McMillan v. Escambia County, 748 F.2d 1037, 1045-47 (5th Cir.1984). Similarly, evidence of elected officials' responsiveness to minority needs "does not overcome evidence that minorities are excluded from political participation." Marengo, 731 F.2d at 1572.
 
 
 73
 In short, the district court erred in concluding that these additional factors supported a defense based on the absence of racial bias, especially where the evidence showed the existence of racially polarized voting. This court has recognized that "the surest indication of race-conscious politics is a pattern of racially polarized voting." Marengo, 731 F.2d at 1567; United States v. Dallas County Commission, 850 F.2d 1430, 1439 (11th Cir.1988), cert. denied, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989) (same); see also Meek, 985 F.2d at 1488 (relying heavily upon evidence of racially and ethnically polarized voting in upholding district court's finding that racial bias substantially motivates voting behavior). As stated, no black candidate has ever won a contested judicial election in the Fourth Circuit or Duval County. This has been so even when the black candidates were clearly more qualified and more experienced than the white candidates. We find these circumstances to be compelling proof of racially biased voting. Accordingly, we conclude that the district court erred in ruling that defendants satisfied their burden of showing an absence of racially biased voting in the Fourth Judicial Circuit and Duval County.
 
 V. CONCLUSION
 
 74
 In summary, we hold that the district court erred in finding that appellants did not satisfy the three core Gingles factors and in ruling that appellees discharged their burden of proving that the voting communities were not driven by racial bias. Therefore, we REVERSE the district court's judgment and REMAND for the district court to provide forthwith an appropriate remedy to the appellants.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 In their reply brief, appellants make clear that they do not challenge the district court's factual findings. Rather, they base their appeal "upon the misconceptions of the law that hampered the District Court in addressing the issues of polarized voting and the totality of circumstances." Appellants' Reply Brief at 2
 
 
 [2]
 The Fourth Judicial Circuit, located in the northern part of Florida, consists of Duval, Clay and Nassau Counties
 
 
 [3]
 The elections and black candidates were: (1) 1972 Primary, Circuit Court, Leander Shaw; (2) 1972 Runoff, Circuit Court, Leander Shaw; (3) 1978 Primary, Circuit Court, Harrell Buggs; (4) 1978 Primary, Duval County Court, Alfred Washington; (5) 1984 Primary, Duval County Court, Denise Prescod; and (6) 1984 Primary, Duval County Court, Dietra Micks
 
 
 [4]
 Plaintiffs' expert, Dr. Allan Lichtman, performed ecological regression and extreme case analyses of the six elections. The ecological regression analysis revealed the following degrees of polarization in the Fourth Circuit and Duval County:
 % of Black Voters % of White Voters
 Voting for Black Cand. (s) Voting for Black Cand. (s)
 4th Circuit:
 1972 Primary
 Leander Shaw
 Circuit 92 24
 County 93 23
 1972 Runoff
 Leander Shaw
 Circuit 97 33
 County 98 32
 1978 Primary
 Harrell Buggs
 Circuit 82 3
 County 81 4
 Duval County:
 1978 Primary 88 13
 A. Washington
 1984 Primary 73 27
 Denise Prescod
 1984 Primary 76 24
 Dietra Micks
 See R6125, Appendix A.
 
 
 [5]
 Before trial, a second black judge was appointed to the county court, R6-125-32-33; R4-84-10-11, but when this case was tried still only one black judge served among the twenty-eight on the circuit court
 
 
 [6]
 Stipulations 30-45 in the pretrial stipulation also recount some of this history of discrimination. R4-64-12-15
 
 
 [7]
 The Florida Supreme Court appointed the Bias Commission, which contained a cross-section of judges, lawyers, and lay citizens from throughout the state. R10-109 (testimony of Judge Henry Adams, Commission member)
 
 
 [8]
 Judge Henry Adams, a Commission member, testified that the Commission unanimously concurred in these findings and recommendations. R10-112
 
 
 [9]
 The analysis of plaintiffs' expert, Dr. Allan Lichtman, showed consistently lower participation by black registered voters than white registered voters in the black-white circuit and county court elections. Plaintiffs' Exhibit 13
 
 
 [10]
 Section 2 of the Voting Rights Act, as amended, provides as follows:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. Sec. 1973.
 
 
 [11]
 We note that this circuit is divided on the questions of whether plaintiffs can establish a section 2 violation by proving the threshold Gingles factors, see Solomon v. Liberty County, 899 F.2d 1012, 1017 (11th Cir.1990) (en banc) (per curiam) (Kravitch, J., specially concurring), and whether defendants can thereafter raise a defense under the totality of the circumstances. Id. at 1033 (Tjoflat, C.J., specially concurring); see Hall v. Holder, 955 F.2d 1563, 1568 n. 9 (11th Cir.1992) (recognizing division)
 
 
 [12]
 In Gingles, the only elections analyzed were elections in which black candidates ran against white candidates
 
 
 [13]
 We also reject the district court's "applicant pool" analysis with respect to the number of black elected judges. The district court focused upon the low number of black attorneys who would be eligible for judicial candidacies. However, the appropriate comparison is the percentage of black citizens or black voters, not the percentage of black lawyers. As the Florida Supreme Court Racial and Ethnic Bias Commission observed:
 A comparison of minority judges to the estimated eligible minority population alone is not responsive to the question of whether the Florida judiciary adequately reflects the racial and ethnic diversity of the citizens of Florida. One way of determining reflectiveness is to examine population proportional representation. That is, whether the number of minority judges reflects proportionately the number of minorities of the general population. A population proportional analysis reveals that minority judges are significantly underrepresented [in proportion] to the general population.
 R10-147-48; Defendant's Exhibit 23 at 15 (emphasis added).
 Moreover, courts have rejected defenses based on an "applicant pool" theory. As the former Fifth Circuit stated, "[t]he necessary link between the percentage of those eligible and the percentage actually selected that exists in school cases and employment cases is missing in voting cases." Marshall v. Edwards, 582 F.2d 927, 936 (5th Cir.1978); see also Martin v. Allain, 658 F.Supp. 1183, 1203-04 (S.D.Miss.1987) (finding fact that small percentage of blacks was eligible to be elected as judges relevant but not controlling and further holding that existence of sufficiently large and geographically compact group which could constitute majority in single-member district was overriding factor).
 
 
 [14]
 See supra note 11
 
 
 [15]
 See supra note 13